RICHARD RAINES, plaintiff in error, *vs.* THE STATE OF
GEORGIA, defendant in error.

1. In case of a capital conviction, where, upon a review of the whole
testimony, the Court is not satisfied with the verdict of the jury, on
account of the incompleteness of the proof, there being evidence
omitted which it was in the power of the State to produce, and more
especially where the presiding Judge failed to charge upon a point of
law insisted upon in argument by defendant's counsel, and upon which
a charge was requested, a new trial will be granted.

Murder, in Washington Superior Court.    Tried before
Judge IVERSON L. HARRIS, at March Term, 1863.

This was an indictment charging the defendant, Richard
Raines, with the murder of his wife, Emily S. Raines, on the
27th of June, 1861, by mixing strychnine with whisky, and
administering it to her, whereof she died in a short time
thereafter.    The indictment was found true by the grand
jury at September Term, 1861, and the defendant was put
on trial at March Term, 1863.

The material facts and circumstances of the case as devel-
oped by the testimony on the trial, are as follows, to-wit:

On the morning of the 27th of June, 1861, the defendant
gave to each of his children a drink of spirituous liquor; he
also prepared a drink for his wife, and sent it to her by one
of his little daughters; Mrs. Raines drank a portion of it,
and immediately asked her little son, who was standing by,
if what he drank was bitter; being answered by the little
boy in the negative, she remarked that what she drank was
bitter; a daughter of the defendant, who was fifteen years of
age at the time of the trial, testified that the defendant poured
the drinks of the children from one bottle, and the drink of
Mrs. Raines from another and a different bottle; after drink-
ing the liquor the family sat down to breakfast, and Mrs.
Raines ate some biscuit and butter, and drank some coffee;
before she arose from the breakfast table she complained of
a burning in her stomach, and shortly afterwards was attacked
with spasms; a neighbor woman, near by, was sent for, and
when she arrived, Mrs. Raines was insensible; the defendant

had bled her in the arm, and was holding it to stop the blood when the neighbor lady arrived.

Mrs. Raines was pregnant at the time, and was within about one month of the time of delivery; she seemed like a woman in labor; her head was drawn back, she gritted her teeth, her limbs jerked and she had three pains, struggles, or spasms, and died; her eyes were turned back, her lips turned purple and her face was palid; a few days before Mrs. Raines' death a physician had visited the house and left some tartar-emetic for some dogs, this was given by Mrs. Raines to several of the dogs, and one of them died; a Coroner's inquest was held over the body of deceased the day after she died, and at the house of defendant; the stomach was taken from the body and placed in a pan, and the defendant sat, or stood by, and witnessed the *post mortem* examination; the pan with its contents was left in the house on a table, and the physicians went out into the yard where the inquest was being held; in a short time it was suggested by one of the physicians that as no directions had been given as to the pan with the stomach in it, it had better be looked after, but when they went back into the house to look for it, the pan was gone; the stomach was afterwards found buried in a field some hundred and fifty yards from the house, but the testimony did not disclose by what agency it was taken from the house and buried in the field; it was disinterred and placed in an earthen jar, and kept by one of the physicians; the contents of the stomach were afterwards carried by Dr. James R. Smith to the city of Augusta, who with Dr. Louis D. Ford and Son, subjected it to chemical examination and analysis. The physicians were of opinion that Mrs. Raines most probably came to her death from poisoning by strychnia, but their minds were not clear on that point, the testimony, as well as their examination of the stomach and its contents, not being of such a character as to relieve them of doubt; the tests applied were unsatisfactory to the physicians. Dr. Smith testified that the color tests did not fully satisfy his mind of the presence of strychnia in the stomach; two of the experiments exhibited the peculiar colors which are said by scienti-

Raines *vs.* The State of Georgia.

fic works to prove the presence of strychnia, the other experiments were unsatisfactory not proving to his mind the existence of the poison, nor producing the effects to be expected from them.   Dr. Louis D. Ford testified, that the chemical experiments carried no further than the color tests, were not satisfactory; only one of the tests with sulphuric acid, and bichromate of potassa, and a part of one of the preparations, produced the highly characteristic color induced by strychnia; those are not the only tests known to science by which strychnine might be detected; there are other tests which if applied might yield more satisfactory results, even to the reproduction of strychnine in a chrystalized state, but such tests were not applied; strychnine may be reproduced in the hands of an expert manipulator in a very small quantity; he made other experiments from preparations obtained from the stomach, upon frogs, and all the experiments taken together induced witness to the opinion that there was probably strychnia in the substance examined, but a neglect to carry the chemical examination further, to the reproduction of strychnia, prevented the witness from having the opinion that there was positively strychnia in the stomach; he did not think there was any other poison except strychnia in the stomach, nor did the experiments lead him to suspect the presence of any other; he did not wish to be understood as saying, that if he had carried the experiments further, he would have found strychnia in the stomach, for that was entirely beyond his knowledge; it was also proved by defendant's daughter hereinbefore alluded to, that the defendant and his wife had been living disagreeably for some time before the death of deceased, and that defendant once threw a smoothing iron at deceased and twice threatened her life.

Pending the examination of Dr. Smith, the following question was propounded to him by the State's Attorney: "Did Mrs. Raines die a natural death, or did she die from the effects of poison, judging from your *post mortem* examination, and your analysis of the stomach and its contents, and from the testimony of the witnesses as heard by you in this case; your opinion as a medical man is asked."

Raines *vs.* The State of Georgia.

Said question was objected to by prisoner's counsel, when the Court intimated to the Attorney General to change his question to the following form : "Whether, from the testimony in the case and his (your) examination as a medical man, of the stomach and its contents, what is your opinion as an expert as to the cause of the death of Mrs. Raines, whether it was the result of natural cause, or of poison."

Prisoner's counsel excepted to the interference by the Court with the conduct of the case, and in suggesting a new form of question to the Attorney General, and this interference was assigned as error.

Defendant's counsel also objected to the question itself, when said question was withdrawn temporarily. Dr. Smith having been withdrawn, was recalled by the State, and the same question, that is, the question framed by the Court, upon his recall was repropounded to him, and objected to by prisoner's counsel; the Court refused to admit said question to be put to the witness, but wrote out the following form for the use of the Attorney General: "From the symptoms described by the witnesses in this case, and which you have heard testified to, in connexion with the analysis of the stomach of Mrs. Raines and its contents, upon the *post mortem* examination thereof, as a medical expert, what is your opinion as to whether her death was produced by natural causes or by poison?"

Counsel for the prisoner objected to the Court's interference again with the State's Attorney in framing said question for him, and objected to the question itself, which objection the Court overruled, and this ruling is assigned as error.

Counsel for prisoner also insists that the first interference of the Court was injurious to the prisoner in this, that before counsel had time to object to the question, the witness answered, "I have not a shadow of a doubt on my mind that she died from strychnine." Which answer the witness said he made without understanding the question, and which the Court rejected and would not suffer to be considered as evidence, had its effect probably upon the minds of the jury.

During the examination of Dr. Ford, the Attorney General

Raines *vs*. The State of Georgia.

sought to prove by him, that if strychnine did not exist in the stomach of Mrs. Raines, some other deadly poison did, without showing what that other poison was, and the Court decided that the question might be put, and stating as a part of his decision of the point made, in the hearing of the jury, that it was competent to prove that poison existed without showing what that poison was, although Dr. Ford, the only witness on that point, swore that he did not think there was any other kind of poison in the stomach; which remark of the Court and the ruling was excepted to by counsel for prisoner, and was assigned as error.

The testimony and argument having closed, the presiding Judge, pursuant to the written request of counsel for defendant, charged the jury as follows, to-wit:

You must be satisfied from the testimony, and beyond a reasonable doubt, that the death was caused by poisons administered by the prisoner. The testimony of experts, as for instance in this case, as to symptoms, indications of poison after analysis of the contents of the stomach, are to be taken as testimony upon the points, and greatly to be regarded as testimony upon the points. If the jury should believe that the facts proven should be true, and yet the deceased might have died from ordinary diseases, then the jury should acquit the prisoner. If the jury should believe that the deceased died of poison, still they must be satisfied that the poison was, knowingly and with malice, administered by the prisoner, with the intention to take the life of the deceased.

The law presumes every man to be innocent until he is found to be guilty. Hence, if the acts and conduct of the prisoner, indicative of innocence, are as strong as his acts and conduct which lead to a suspicion of guilt, and, when weighed in the scale, are equal in weight, such legal presumption of innocence must turn the scale in favor of the defendant.

The domestic relations of husband and wife, parent and child, etc., raise strong presumption against the murder of a wife by her husband. These presumptions are strong in proportion to the nearness and tenderness of that relation. The defendant is entitled to the benefit of these presumptions, and

they are rendered still stronger in this case if the jury believe from the evidence that Mrs. Raines was eight months gone in pregnancy, as, in that event, he would be under the influence of parental affection for his unborn child, in addition to that of a husband for his wife. If, from all the evidence, the jury should come to the conclusion that the defendant is only probably guilty, then, in the opinion of the Court, they should find the prisoner not guilty.

After twelve hours' deliberation, the jury returned a verdict of guilty against the prisoner.

Counsel for the defendant moved for a new trial of the case, on the following grounds:

1st. Because the verdict is contrary to law and the charge of the Court.

2d. Because the verdict is contrary to the evidence.

3d. Because the verdict is not supported by the evidence.

4th. Because the verdict is strongly and decidedly against the weight of the evidence.

5th. Because the Court omitted to charge the following proposition, which, though not embodied in the written request, was urged and insisted on by counsel for defendant in their argument to the jury, to-wit:

"That Dr. Ford having sworn in substance that other and conclusive tests of the presence of strychnia were in his power to have applied, and were not applied, the omission of the State to produce that best evidence is a circumstance most strongly to be weighed by the jury in favor of the innocence of the accused."

6th. Because the Court erred in interfering with and suggesting to the State's Attorney forms of questions proper to be propounded to the witnesses, and in allowing the questions to be asked after objection.

The new trial was refused by the Court, and that decision is the error alleged.

E. H. Pottle and H. V. Johnson, for defendant in error.

W. W. Montgomery, Attorney General, *contra.*

*By the Court.*—LUMPKIN, C. J., delivering the opinion.

The enormity of the offence charged in the indictment should induce great caution lest our feelings should get the better of our judgment. And in a case like this, unless all the testimony within the power of the State to produce is forthcoming, the result must needs be unsatisfactory.

I will advert briefly to a few instances, or what may justly be considered omissions, in the evidence which might have been supplied. And the failure to do so, without imputing any design on the part of the State—for I take pleasure in saying that the character of the Attorney General for official rectitude places him far above any such imputation—still the proof is left incomplete, and the finding of the jury cannot be otherwise than unsatisfactory.

Was it customary with the prisoner to serve his family with a morning dram, or was this a solitary instance? If the latter, it would serve to strengthen the probability of his guilt. Were the children as well as the wife generally included in the treat? If not, the fact that they were on this occasion would suggest that it was intended as a blind to lull suspicion.

Again, Louisa Raines, the daughter, testifies that her mother and father had lived disagreeably together for some time before her mother's death, and that he once threw a smoothing iron at her; now, Mrs. Elizabeth Moye swears that Raines and his wife were separated at one time; but does not know how long before her death they came together again. From the testimony of Louisa it does not appear at what period this ill-feeling and ill-treatment were manifested. Was it before the separation? How long was it before the death? It would seem that on the morning of that sad occurrence no such feud existed or interfered with the family enjoyments. This same witness states that immediately after drinking the toddy, her mother asked her brother Thomas if what he drank was bitter? How important that the son should have corroborated this statement, as not only confirmatory of the truth of the little girl's evidence, but of the

VOL. XXXIII—37.

mother's declaration, made at the time, of the nature of the fluid she drank. It was disclosed in the discussion that Thomas was older than Louisa.

We cannot shut our eyes to the fact, that without the daughter's testimony the prosecution cannot be sustained; that she was only thirteen years old when this crime is alleged to have been committed ; that she never saw her father from the death of her mother until confronted with him on the trial, and that during the long interval which intervened, she lived with her uncle, Richard Strange, making his house her home, and that between this maternal uncle and the prisoner there was no friendly intercourse and no visiting for years before the death of Mrs. Raines. I do not allude to these circumstances in order to impugn the testimony of the child, but as suggestive of the importance of supporting her whenever it could be done.

I approach now the medical view of the case. And what is the substance and strength of the opinions of the highly intelligent and respectable physicians who were examined on the trial? " That there was *probably* strychnia in the contents of the stomach," and that " a neglect to carry the chemical examination further to the reproduction of strychnia in the chrystalized state, prevents the witnesses from having the opinion that there was positively strychnia in the stomach," "and why these tests were not adopted they hardly know." And this is the whole case. Was I not warranted in assuming that without the evidence of the daughter the prosecution must have failed? For it will not be contended that a *strong probability* of guilt will satisfy the demands of the law. There must be *certainty*, beyond a reasonable doubt. And we cannot but fear that injury may have resulted to the prisoner in consequence of the omission of the Court to charge the jury as to the effect of the neglect of the State, to apply other and conclusive tests to detect the existence of strychnia in the stomach of the deceased; not that we would hold that in all cases this is necessary. True, the discovery of poison by means of the chemical tests affords undoubtedly the clearest and most satisfactory evidence that can be ob-

tained, and therefore, should always be resorted to when practicable. Some, indeed, have gone so far as to insist that no case of poisoning should be considered as proven unless the poison had been discovered by these tests. Such is not our position, nor do we indorse the principle contained in the verbal request to charge during the progress of the argument, to-wit, that the omissions of the State to produce this evidence is a circumstance to be most *strongly weighed* by the jury in favor of the innocence of the prisoner. But what we contend for is this: that when it is entirely in the power of the State, which has control of the whole subject, to apply these conclusive tests, the importance of which is known to the medical examiners, and it is not done, and no reason is assigned for the neglect, while other tests, which are less satisfactory, are applied, we hold that this is a circumstance which may be legitimately used by counsel before the jury, as calculated to raise a doubt, to the benefit of which the accused is entitled; a proposition which is not denied by the Attorney General, but which, owing to the controversy which sprung up upon this and kindred points, was overlooked by the jury, but which his Honor would have done well to have put fairly and fully to the jury in his concluding charge.

Upon the whole, when we learn from the bill of exceptions that owing to the excitement upon the public mind, more than one hundred jurors who were impanelled were disqualified from serving, owing to bias and prejudice, or the formation and expression of opinion as to the guilt of the accused, we are inclined to think that a calm and dispassionate administration of criminal justice requires that this case be sent back for a re-hearing. True, a new trial will cause some delay. But what is this compared with the capital conviction of an innocent man? and the re-investigation will either lead to the acquittal of the defendant, or satisfy the most sceptical that he suffers justly the extreme penalty of the law.

I have carefully abstained from expressing any opinion upon what may be called the *moral evidence* in this case, such as the conduct of the prisoner during the illness of his wife,

and the *post mortem* examination. These belong more properly to the jury. But two cases have occurred within my own knowledge, which, I must confess, have weighed heavily on my mind during this investigation. I knew a young man who married the wife of his choice, and never were nuptials more blessed. He rose one morning, and was in the act of dressing, conversing in the meantime gaily with his young bride; observing that she had ceased to reply to him, he looked round to her, still in bed, and to his dismay found her speechless and writhing in convulsions. She expired in a few moments. She had enjoyed uninterrupted health, and was eight months gone in pregnancy. The other case was that of Mrs. J., the mother of four children, and again in the family way. She was the pride of her own sex and the admiration of ours. A more perfect specimen of womanhood it has rarely been my privilege to look upon. After dining with her husband, he took a stroll to the post office, but was arrested by a message before he reached there, "that his wife was dying of convulsions." She lingered a few hours, and expired in great agony. As gun-shot wounds set at defiance all the laws of projectility, how frequently is medical skill, as well as medical opinion, baffled by similar occurrences. But I forbear.

Let the judgment be reversed.